IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LINN H. LEWIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. 11-3986 |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                        April 11, 2012

Plaintiff, Linn H. Lewis, seeks judicial review, under 42 U.S.C. § 405(g), of the final

decision of the Commissioner of Social Security (the "Commissioner") denying his claim for

disability insurance benefits under Title II of the Social Security Act. Plaintiff filed for disability

insurance benefits on November 24, 2008, alleging disability as of June 1, 2005. He also filed a

concurrent application for Supplemental Security Income ("SSI") under Title XVI of the act.

Although plaintiff was found to be disabled as of November 24, 2008, and was thus awarded SSI

benefits, the Commissioner determined that plaintiff was not disabled before December 31, 2007,

the date on which he was last insured for disability benefits, and thus concluded that he was not

eligible for disability insurance benefits. At issue here is whether substantial evidence supports

the Commissioner's decision that plaintiff was not disabled before December 31, 2007. I referred

the matter to Magistrate Judge Linda K. Caracappa, who submitted a report and recommendation

recommending that I affirm the Commissioner's decision. Plaintiff has now filed objections to

the magistrate judge's report. For the reasons that follow, I will overrule plaintiff's objections

and affirm the final decision of the Commissioner.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 24, 2008, plaintiff, who was forty-four years old at the time, filed applications for both disability insurance benefits and SSI, alleging disability as a result of chronic pancreatitis,[1] gastrointestinal problems, and fibromyalgia.[2] (R. 12, 22, 111, 115.) He claimed that he became disabled on June 1, 2005, around the time that he was diagnosed with pancreatitis, and that he had not worked since then.

Plaintiff's medical records reveal that plaintiff was diagnosed with diverticulitis in October 1997, after being hospitalized with abdominal pain.[3] (R. 587–593.) After several recurrences, plaintiff underwent a sigmoid colon resection for chronic diverticulitis on March 16, 1998. (R. 572–574.)

The record does not contain evidence of further gastrointestinal problems until June 8, 2005, when plaintiff was admitted to St. Luke's Quakertown Hospital after the sudden onset of

---

[1] Pancreatitis is the "inflammation of the pancreas." *Dorland's Illustrated Medical Dictionary* 1388 (31st ed. 2007) [hereinafter *Dorland's*]. "[I]t may be acute or chronic, asymptomatic or symptomatic, and is often complicated by autodigestion of pancreatic tissue by [the pancreas's] own enzymes." *Id.* The most common causes of pancreatitis "are complications from alcoholism and biliary tract conditions such as gallstones." *Id.*

[2] Fibromyalgia refers to "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's* at 711. Plaintiff's primary-care physician, Dr. Deborah Ramanathan, noted in her treatment records that plaintiff had had "severe pains from fibromyalgia" since 1994. (R. 610.) The final decision of the Commissioner made no findings with respect to plaintiff's fibromyalgia, however, and because plaintiff does not challenge the Commissioner's failure to address his fibromyalgia, I do not discuss the condition here.

[3] Diverticulitis is the "inflammation of a diverticulum, especially inflammation related to colonic diverticula, which may undergo perforation with abscess formation." *Dorland's* at 565. Colonic diverticula are "acquired herniations of the mucosa of the colon through the muscular layers of its wall; they sometimes become inflamed." *Id.*

severe abdominal pain. (R. 234.) He was diagnosed with pancreatitis, caused by alcohol use, and

discharged from the hospital on June 15, 2005. (R. 230.) He was prescribed pancreatic enzymes,

although apparently he could not afford the prescription. (R. 221.) He also began taking Percocet

on and off for pain relief. (R. 37, 221.) In a follow-up visit with his gastroenterologist, Dr.

Jerome M. Burke, on July 5, 2005, plaintiff reported some continued pain and other symptoms.

(R. 221.) But he subsequently failed to appear for an August 16, 2005, appointment with Dr.

Burke (R. 246), and the record contains no further evidence of medical treatment for his

pancreatitis until February 7, 2007, when a CT scan showed an enlarging pancreatic pseudocyst

but no pancreatic inflammation.[4] (R. 217.)

On July 20, 2007, plaintiff was again admitted to St. Luke's Quakertown Hospital after

reporting two days of abdominal pain and nausea. (R. 209.) He reportedly acknowledged alcohol

binges and stated that his last drink had been about five days earlier. (*Id.*) Plaintiff was diagnosed

with acute pancreatitis with pseudocyst formation and was placed on intravenous fluids and pain

medication. (R. 293–294.) By the time he was discharged after nine days in the hospital, he was

tolerating food without nausea or pain and no longer required pain medication. (*Id.*)

Plaintiff was hospitalized several more times in 2008. On January 23, 2008, plaintiff was

admitted to St. Luke's after having complained of "worsening epigastric pain with nausea [and]

vomiting" and "a poor appetite" beginning on January 20, 2008. (R. 195.) He was transferred to

Thomas Jefferson University Hospital on January 29, 2008, for certain tests and procedures.

(R. 652–653.) While plaintiff was hospitalized, one of his doctors completed a Pennsylvania

---

[4] A pancreatic pseudocyst is "a cystic collection of fluid and necrotic debris whose walls
are formed by the pancreas and nearby organs. It occurs as a complication of acute pancreatitis
and may subside spontaneously or become secondarily affected and develop into an abscess."
*Dorland's* at 1565.

Department of Public Welfare "employability assessment" form, in which the doctor checked the box corresponding to the statement that plaintiff "is currently disabled due to a temporary condition . . . preclud[ing] any gainful employment." (R. 559.) The doctor noted that the temporary disability began on January 23, 2008, and was expected to last until April 1, 2008. (*Id.*) Plaintiff was discharged from the hospital on February 1, 2008. (R. 652.)

Plaintiff was admitted to the hospital again on November 3, 2008, complaining of "five days of worsening upper abdominal pain with nausea." (R. 490.) Plaintiff reportedly had been "doing well" until then and was not taking any medication at the time. (R. 497.) After various tests were performed and "[g]allbladder sludge was noted," a laparoscopic cholecystectomy was performed on November 7, 2008, "to prevent further episodes of acute pancreatitis."[5] (R. 474; *see also* R. 484–486.)

About a month later, plaintiff went to the emergency room complaining of "intractable pain exacerbated by eating" and was admitted to St. Luke's on December 3, 2008. (R. 463–464.) A follow-up MRI of his abdomen had been performed a week earlier and showed chronic pancreatitis as well as a reaccumulation of his pancreatic pseudocyst. (R. 463.) Plaintiff reportedly was not taking his pancreatic enzymes as directed because he could not afford the medication, and he reported needing "two to three Percocet daily to alleviate his pain." (R. 468.) Plaintiff was transferred to Thomas Jefferson University Hospital on December 7, 2008, for "further workup." (R. 639.) After various procedures, including endoscopic drainage of the pancreatic pseudocyst, plaintiff was discharged on December 13, 2008. (R. 640.)

Meanwhile, on November 24, 2008, plaintiff filed applications for both disability

---

[5] A cholecystectomy is the "surgical removal of the gallbladder." *Dorland's* at 354.

insurance benefits and SSI. He claimed that he was "sick all of the time" and had "horrible pain in [his] abdomen." (R. 115.) He also claimed that he had "extreme fatigue" and was not "eating right" because he was "nauseated all of the time" and had "terrible pain" when he ate. (*Id.*) He thought that he could probably lift 50 pounds but reported that his condition affected his ability to sit, stand, walk, climb stairs, squat, bend, reach, and kneel. (R. 128.) He also explained that it was "impossible to seek gainful employment" because he did not know when he would be "hospitalized again after so many times since 2005." (R. 130.)

In connection with plaintiff's disability application, plaintiff was examined by a consulting state-agency physician, Dr. Singer, on March 20, 2009. Dr. Singer reported that plaintiff "continues to have nausea on a daily basis" and "continues to have pain especially after eating." (R. 661–662.) He advised that plaintiff was to "limit lifting and carrying to 20 pounds occasionally and limit standing and walking to three hours out of an eight-hour period." (R. 664.) He found "[n]o limitations on sitting" or on "pushing and pulling." (*Id.*) He also recommended that plaintiff "limit bending to occasional kneeling, stooping, and crouching." (*Id.*)

After reviewing plaintiff's records, a state-agency medical consultant assessed plaintiff's residual functional capacity as of December 31, 2007. He determined that, as of that date, plaintiff could frequently lift or carry 10 pounds and could occasionally lift or carry 20 pounds; could stand or walk about six hours in an eight-hour workday, could sit about six hours in an eight-hour workday; had no limitations on his ability to push or pull; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 678–683.)

Plaintiff was found to be disabled as of the date of his application, November 24, 2008, and was awarded SSI benefits. (R. 22.) But the Social Security Administration denied plaintiff's application for disability insurance benefits on April 21, 2009, finding that plaintiff's condition

was not disabling before December 31, 2007, when his insured status expired.[6] (R. 12, 52.) Plaintiff timely filed a request for a hearing (R. 57), and a hearing was held before an administrative law judge ("ALJ") on April 8, 2010 (R. 12). Plaintiff, who was represented by counsel, testified at the hearing, as did a vocational expert and plaintiff's girlfriend. (R. 21–22.)

By the time of the hearing, additional evidence had been added to the record, namely, a "gastritis/irritable bowel syndrome" medical-assessment form completed by Dr. Shashin Shah, one of plaintiff's treating physicians, on March 12, 2010. (R. 722–725.) He noted that plaintiff's medication caused fatigue and noted several other limitations that would affect plaintiff's ability to work—for example, that plaintiff could continuously sit or stand for only 30 minutes at a time, that plaintiff would need eight restroom breaks during the day, as well as two additional breaks during which plaintiff would have to rest 30 minutes before returning to work, and that plaintiff would likely be absent from work three days a month. (R. 723–724.) Dr. Shah further opined that those limitations existed before January 1, 2008, asserting that plaintiff had been hospitalized and had received treatment before January 1, 2008. (R. 725.)

On May 17, 2010, the ALJ issued an adverse decision denying disability insurance benefits. (R. 12–19.) Applying the Social Security Administration's five-step sequential evaluation process for determining whether an individual is disabled, *see* 20 C.F.R. § 404.1520,[7]

---

[6] To be entitled to disability insurance benefits, a claimant must not only be disabled but must also be "insured for disability insurance benefits." 42 U.S.C. § 423(a). Because plaintiff's insured status expired on December 31, 2007, he was required to demonstrate that he became disabled before that date. *See Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

[7] The Third Circuit has summarized the five-step process as follows:

In the first four steps the burden is on the claimant to show that [he] (1) is not currently engaged in gainful employment because [he] (2) is suffering from a severe impairment (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves [him] lacking the [residual functional capacity] to return

the ALJ found that plaintiff was not disabled before December 31, 2007, when plaintiff's insured status expired. The ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since June 1, 2005, his alleged disability onset date. (R. 14.) At step two, the ALJ found that plaintiff's pancreatitis, diverticulitis, and shoulder impairment[8] were "severe" impairments (R. 14), but at step three, she determined that they did not meet any of the listed impairments at any time before December 31, 2007 (R. 15–16). At step four, the ALJ found that plaintiff had the residual functional capacity to perform a full range of light work as defined in 20 C.F.R. § 404.1567(b). (R. 16–18.) Because plaintiff's past work constituted medium and heavy work, however, the ALJ found that plaintiff could not perform any past work. (R. 18.) But, relying on the medical-vocational guidelines, and considering plaintiff's age, education, and work experience, the ALJ found that jobs "existed in significant numbers in the national economy that [plaintiff] could have performed," and thus concluded that plaintiff was not disabled before his insured status expired on December 31, 2007. (R. 19.)

Plaintiff timely requested review by the Appeals Council. (R. 7.) The Appeals Council denied this request for review on April 20, 2011, and as a result, the ALJ's decision became the final decision of the Commissioner. (R. 1.)

---

to [his] previous employment. If the claimant satisfies step 3, [he] is considered per se disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform.

*Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005) (internal citations omitted).

[8] Although plaintiff did not assert his shoulder impairment as a basis for his disability claim, the medical records provided by plaintiff revealed that he had been diagnosed with acromioclavicular joint dislocation in 2003, and the ALJ took this impairment into account in her decision. (R.14–15.) Nonetheless, because plaintiff's challenges to the ALJ's decision do not relate to any findings regarding his shoulder impairment, I do not discuss it here.

Plaintiff filed this action on June 17, 2011, seeking review of the Commissioner's decision to deny him disability insurance benefits. I referred the matter to a magistrate judge, who, in a report and recommendation dated January 31, 2012, concluded that the Commissioner's decision was supported by substantial evidence and thus recommended that I affirm the Commissioner's decision. Plaintiff has now filed objections to the magistrate judge's report.

## II.    STANDARD OF REVIEW

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects. *See* 28 U.S.C. § 636(b)(1). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *See id.*

With respect to the Commissioner's decision, however, the standard of review is deferential. Although a district court exercises "plenary review" over any legal questions presented by the Commissioner's decision, a court may review the Commissioner's "factual findings only to determine whether the administrative record contains substantial evidence supporting the findings." *Allen v. Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005). As the Supreme Court has explained, "[s]ubstantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). This standard requires "more than a mere scintilla" of evidence but "somewhat less than a preponderance of the evidence." *Rutherford*, 399 F.3d at 552.

The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360; *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). In determining whether the Commissioner's decision is supported by substantial evidence, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with [the Commissioner's] finding." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

## III.   DISCUSSION

In seeking review of the ALJ's decision (which became the Commissioner's final decision), plaintiff raised four issues:[9] first, that the ALJ erred by failing to consult a medical advisor to help infer the onset date of his disability; second, that the ALJ erred in giving little weight to certain medical opinions; third, that the ALJ erred in determining his residual functional capacity, because she improperly rejected the assessments of his treating physician and others, failed to consider the side effects of his medication, and failed to properly consider his subjective complaints of pain and fatigue; and fourth, that the ALJ erred in ignoring the

---

[9] Plaintiff raised nine issues in his brief, but for ease of discussion I have consolidated some of them.

testimony of a vocational expert and instead relying solely on the medical-vocational guidelines. The magistrate judge found no merit in any of plaintiff's claims and recommended that the Commissioner's decision be affirmed. Plaintiff has objected to the magistrate judge's report and recommendation with regard to nearly every issue raised in his initial request for review. As I explain more fully below, however, these objections are without merit, and I will therefore adopt the magistrate judge's report and recommendation and affirm the final decision of the Commissioner.

### A.      Failure to Consult Medical Advisor to Determine Disability Onset Date

Plaintiff first claims that the ALJ erred by failing to consult a medical advisor to help establish the onset date of his disability. The magistrate judge correctly rejected this argument.

Social Security Ruling ("SSR") 83-20 directs an ALJ to "call on the services of a medical advisor," SSR 83-20, 1983 WL 31249, at *3 (1983), when "the alleged onset and the date last worked are far in the past and adequate medical records are not available" and it is therefore necessary "to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process," *id* at *2. Thus in *Newell v. Commissioner of Social Security*, 347 F.3d 541 (3d Cir. 2003), the Third Circuit held that the ALJ should have consulted a medical advisor to determine the claimant's disability onset date in light of the fact that the claimant did not seek treatment until a year after the alleged onset date of her disability because she was uninsured and could not afford treatment and the fact that medical records for the relevant time period were therefore unavailable. Similarly, in *Walton v. Halter*, 243 F.3d 703 (3d Cir. 2001), the Third Circuit held that the ALJ was required to consult a medical advisor because the alleged onset of claimant's bipolar-manic depression was over thirty years earlier and records

10

relating to the claimant's treatment during the relevant time period were no longer available.

But the Third Circuit has also made it clear that the requirement to consult a medical advisor to determine the disability onset date does not apply where, as here, the claimant's medical records are not incomplete or conflicting. *See, e.g.*, *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (not precedential) ("[F]urther decisions of our court have confirmed that *Walton*'s directive to seek out the services of a medical advisor is limited to situations where the underlying disease is progressive and difficult to diagnose, where the alleged onset date is far in the past, and where medical records are sparse or conflicting"). Indeed, as the Third Circuit has asserted, the court has "generally applied SSR 83-20 only where medical evidence from the relevant period is unavailable." *Klangwald v. Comm'r of Soc. Sec.*, 269 F. App'x 202, 205 (3d Cir. 2008) (not precedential); *see also Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 108 (3d Cir. 2007) (not precedential) (distinguishing *Newell* and *Walton* and finding no error in ALJ's failure to consult medical advisor where ALJ "had access to adequate medical records from the time period before the expiration of [claimant's] insured status, and these records did not support her alleged onset date").

Here, as the magistrate judge noted, the ALJ had access to adequate medical records for the relevant time period, namely, the period from plaintiff's alleged onset date to the date his insured status expired, as well as records from 2008 and 2009. And, as discussed in more detail below with respect to plaintiff's other objections, these records support the ALJ's conclusion that, although plaintiff's impairments were severe before his insured status expired, they did not render him unable to work.

In his objections to the magistrate judge's report, plaintiff contends that "the magistrate judge [did] not even address the issue of whether or not all of the medical records during that

11

time period were obtained" (Objections to the Report & Recommendation of the Magistrate ("Pl.'s Objections") ¶ 6, at 5), and he objects to the magistrate judge's finding that he received no medical treatment between the time of his hospitalization in 2005 and his subsequent hospitalization in 2007, asserting that such a finding is not supported by the record or his testimony (*id.* ¶ 7, at 6).

As a threshold matter, the Commissioner argues that plaintiff waived this argument because he raised this issue for the first time in his objections to the magistrate judge's report. Generally, issues raised for the first time in objections to a magistrate judge's report are deemed waived. *See Jimenez v. Barnhart*, 46 F. App'x 684, 685 (3d Cir. 2002) ("[B]ecause [claimant] raised the argument that she is entitled to a closed period of disability for the first time in her objections to the Magistrate Judge's Report and Recommendations, and not in her opening brief, we deem this argument waived."); *accord Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

In any event, plaintiff points to nothing in his testimony before the ALJ or elsewhere in the record that suggests that the medical records presented to the ALJ were incomplete or that additional relevant medical evidence was unavailable. Plaintiff's counsel did state at the hearing that plaintiff "was in the hospital in 2006" and that plaintiff "will tell you that he was in the hospital." (R. 26.) But plaintiff never so testified, and counsel's statements are not sufficient to establish that plaintiff's medical records were incomplete.

Because the ALJ had adequate medical evidence on which to base her determination as to the onset date of plaintiff's disability, there was no need to consult a medical advisor under SSR 83-20.

**B.      Weight Given to Medical Opinions**

Plaintiff next contends that the ALJ erred in giving little weight to the opinions of his treating physicians and the state consultative examiner and improperly substituted her own medical judgment. I disagree.

**1.      Opinions of Treating Physicians**

Plaintiff claims that the ALJ failed to give appropriate weight to a variety of evidence, including a Pennsylvania Department of Public Welfare "employability assessment" form; his treatment records from Dr. Deborah Ramanathan, his primary-care physician; his records from Thomas Jefferson University Hospital, St. Luke's Quakertown Hospital, and Bethlehem Surgical Center; an endoscopic ultrasound, CAT scan, and MRI; and a "gastritis/irritable bowel syndrome" medical-assessment form completed by Dr. Shashin Shah, one of plaintiff's physicians. Much of this evidence post-dates December 31, 2007, the date plaintiff's insured status expired.

Generally, "opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). Here, however, the magistrate judge concluded, and I agree, that the ALJ was justified in giving little weight to the medical evidence post-dating the expiration of plaintiff's insured status. The magistrate judge explained that in challenging the ALJ's decision to give this evidence little weight, plaintiff was overlooking "the fact that the ALJ was supposed to be considering medical evidence that plaintiff was disabled during the relevant time period of June 1, 2005 through December 31, 2007." (Report & Recommendation at 16.) Plaintiff objects to the magistrate judge's reasoning, asserting that the evidence post-dating the expiration of his

insured status is still relevant in determining whether he was disabled before his insured status expired and should therefore have been given more weight.

As many courts have recognized, "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the [claimant's] pre-expiration condition," *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988), because such evidence "may bear upon the severity of the claimant's condition before the expiration of his or her insured status," *Loza v. Apfel*, 219 F.3d 378, 396 (5th Cir. 2000) (internal quotation marks omitted). But such subsequent medical evidence or a "retrospective diagnosis" may be considered only if it is "corroborated by . . . evidence relating back to the claimed period of disability." *Newell*, 347 F.3d at 547; *see also Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). Moreover, in considering such subsequent medical evidence, one must keep in mind that "[i]t is the disability, and not just the impairment, that must have existed before the [claimant's] insured status expired." *Kelly v. Chater*, No. 96-6156, 1997 WL 85839, at *1 (2d Cir. Feb. 27, 1997) (not precedential); *see also Deblois v. Secretary of Health & Human Servs.*, 686 F.2d 76, 79 (1st Cir. 1982) (explaining that "[i]t is not sufficient for [claimant] to establish that his mental impairment had its roots prior to [his date last insured]," and that he must establish that his "impairment was of a disabling level of severity as of that date").

Turning first to the Pennsylvania Department of Public Welfare form, which was completed on January 29, 2008, I see no error in the ALJ's decision to give little weight to the form, because it said nothing about plaintiff's condition before December 31, 2007. Plaintiff's doctor checked the box corresponding to the statement that plaintiff "is currently disabled due to a temporary condition . . . preclud[ing] any gainful employment." (R. 559.) He noted that the temporary disability began on January 23, 2008, and was expected to last until April 1, 2008.

14

(*Id.*) Plaintiff was hospitalized at the time in connection with his pancreatitis, having complained of "worsening epigastric pain with nausea [and] vomiting" and "a poor appetite" beginning on January 20, 2008. (R. 507.) The fact that plaintiff's pancreatitis may have worsened and become disabling *after* the expiration of his insured status, however, says nothing about whether his condition was disabling *before* the expiration of his insured status. Because there is nothing in the form pertaining to plaintiff's condition before December 31, 2007, I see no error in the ALJ's decision to give little weight to this form.

With respect to the medical records from plaintiff's primary-care physician, Dr. Ramanathan, the ALJ properly accorded little weight to the records post-dating December 31, 2007. Although plaintiff began seeing Dr. Ramanathan before he was diagnosed with pancreatitis in June 2005, there are no treatment records addressing plaintiff's pancreatitis until December 23, 2008. Indeed, Dr. Ramanathan did not even see plaintiff between March 2006, when he complained of an eye infection (R. 609), and August 1, 2008, when he complained of "body aches and pain." (R. 610). In her treatment notes dated December 23, 2008, Dr. Ramanathan did note that plaintiff had "had pancreatitis for the past three years" (R. 611), but her notes contain nothing regarding the severity of his condition during the prior three years and nothing to suggest that plaintiff had any functional limitations at any time before his insured status expired on December 31, 2007. Because there is no dispute here that plaintiff suffered from pancreatitis before December 31, 2007, and because Dr. Ramanathan's treatment records do not address the question whether his impairment rose to the level of a disability before that date, I cannot conclude that the ALJ erred in according the records little weight.

The same reasoning applies to the records from Thomas Jefferson University Hospital and Bethlehem Surgical Center, which are from the periods January 29, 2008, to January 26,

2009, and March 10, 2009, to March 23, 2009, respectively (R. 617–660, 668–677.) Plaintiff points to nothing in these records that pertains to his condition before December 31, 2007.

With respect to the records from St. Luke's Quakertown Hospital, the ALJ thoroughly discussed the records relating to plaintiff's hospitalizations in 2005 and 2007 in connection with his pancreatitis. (*See* R. 14–15.) To the extent that plaintiff is challenging the ALJ's failure to discuss the records from his hospitalizations in 2008 and 2009, I see no merit in his claim—he points to nothing in those records that addresses the severity of his condition, or any limitations he may have had, before December 31, 2007.

Similarly, with respect to plaintiff's endoscopic ultrasound, CAT scan, and MRI, the ALJ fully discussed the various diagnostic tests that plaintiff underwent between June 1, 2005, and December 31, 2007, in connection with his pancreatitis, including CAT scans, radiographs, and ultrasounds. (*See* R. 14–15.) Plaintiff does not specify the particular tests (i.e., the date on which they were performed) that the ALJ allegedly failed to consider.

Finally, with respect to the "gastritis/irritable bowel syndrome" medical-assessment form completed by Dr. Shah, I cannot conclude that the ALJ erred in according little weight to this evidence. Dr. Shah completed the form on March 12, 2010, and noted various limitations resulting from plaintiff's pancreatitis that would affect his ability to work—he noted, for example, that plaintiff's medication caused fatigue and drowsiness, that plaintiff could continuously sit or stand for only 30 minutes at a time, that plaintiff would need eight restroom breaks during the day, as well as two additional breaks during which plaintiff would have to rest 30 minutes before returning to work, and that plaintiff would likely be absent from work three days a month. (R. 722–725.) Although Dr. Shah did not begin treating plaintiff until May 12, 2009 (R. 722), he opined that those limitations existed before January 1, 2008, asserting that

16

plaintiff had been hospitalized and had received treatment before January 1, 2008. (R. 725.) But

such a "retrospective diagnosis" constitutes relevant evidence of the onset of disability only to

the extent that it is "corroborated by . . . evidence relating back to the claimed period of

disability." *Newell*, 347 F.3d at 547. Here, however, other than plaintiff's allegations that he

became disabled on June 1, 2005, there is no evidence corroborating Dr. Shah's opinion that the

limitations described in his assessment form existed before January 1, 2008. Indeed, the ALJ

reviewed the records from plaintiff's prior hospitalizations, which Dr. Shah apparently relied on

in giving his opinion, and reasonably determined that the evidence did not "support a conclusion

that the objectively determined medical conditions are of such severity that they could reasonably

be expected to give rise to disabling pain or other limitations." (R. 18.) I thus find no error in the

ALJ's decision to give little weight to Dr. Shah's assessment.[10]

### 2.   Consultative Examination Report

Plaintiff also contends that the ALJ improperly rejected the medical determination of the

consultative examiner, Dr. Gregory Singer. I disagree.

Plaintiff was examined by Dr. Singer, a consultant for the state agency assessing

plaintiff's disability applications, on March 20, 2009. The ALJ explained that she gave little

weight to Dr. Singer's consultative examination report because his examination was conducted

well after the expiration of plaintiff's insured status and addressed plaintiff's condition at the

---

[10] Plaintiff objects to the magistrate judge's finding that "[n]either Dr. Ramanathan nor Dr. Shaw made a recommendation that plaintiff was disabled prior to the December 31, 2007 date last insured." (Report & Recommendation at 16.) While I agree with plaintiff that Dr. Shah suggested that plaintiff was unable to work before December 31, 2007, I see nothing in Dr. Ramanathan's records addressing the severity of plaintiff's condition, or any limitations he may have had, before that date.

time, not his condition before December 31, 2007. (R. 17.) Because plaintiff points to nothing in Dr. Singer's report that pertains to plaintiff's condition before his insured status expired on December 31, 2007, I see no error in the ALJ's decision to accord little weight to the report.

In sum, the ALJ was justified in giving little weight to the medical evidence post-dating the expiration of plaintiff's insured status, including the opinions of his treating physicians and Dr. Singer, the consultative examiner. In addition, I see no basis for plaintiff's contention that the ALJ substituted her own judgment for that of plaintiff's treating physicians or Dr. Singer. The fact that the ALJ gave little weight to this opinion evidence does not mean that she substituted her own judgment. The ALJ properly reviewed plaintiff's medical records from 2005 through 2007, and, as discussed more fully below, that medical evidence supports her determination that, although plaintiff suffered from severe impairments before December 31, 2007, he remained able to engage in gainful activity.[11]

### C.      Plaintiff's Residual Functional Capacity

Plaintiff next contends that the ALJ erred in determining his residual functional capacity.

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (internal quotation marks omitted). It represents the most that an

---

[11] Plaintiff also asserts that the ALJ gave little weight to all the medications that he was taking. But, as discussed below in connection with plaintiff's claim that the ALJ failed to consider the side effects of his medication in assessing his residual functional capacity, except for plaintiff's testimony that he had been taking Percocet on and off since the onset of his pancreatitis, there is no evidence that plaintiff was consistently taking any medication between his alleged onset date of June 1, 2005, and the expiration of his insured status on December 31, 2007.

individual can still do despite the limitations caused by his impairment. *See* 20 C.F.R.

§ 404.1545(a)(1). Here, the ALJ found that plaintiff had the residual functional capacity to

perform a "full range of light work" as defined in 20 C.F.R. § 404.1567(b).[12] (R. 18.)

In reaching this determination, the ALJ first discussed plaintiff's allegations of severe

abdominal pain, which plaintiff claimed caused fatigue and other disabling symptoms and

prevented him from working. (R. 16.) The ALJ found that plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," but found that his

"statements concerning the intensity, persistence, and limiting effects of these symptoms [were]

not credible to the extent they [were] inconsistent with the [ALJ's] residual functional capacity

assessment [that plaintiff could perform a full range of light work]." (*Id.*) With respect to

plaintiff's alleged fatigue, the ALJ found "no indication that [plaintiff] sought treatment for his

fatigue or received any referrals for such treatment prior to . . . his date last insured." (R. 16–17.)

With respect to plaintiff's "alleged inability to sit in one position for too long," the ALJ noted

that the state-agency medical consultant, in his assessment of plaintiff's residual functional

capacity of December 31, 2007, had "found [plaintiff] to be able to sit for six hours in an eight-

hour workday." (R. 17.) This was consistent with the determination of Dr. Singer, who, in his

---

[12] According to the regulations:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds. Even though the weight lifted may be
very little, a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and pulling
of arm or leg controls. To be considered capable of performing a full or wide range
of light work, [an individual] must have the ability to do substantially all of these
activities. If someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

consultative examination report, "found [plaintiff] to have no sitting limitations" as of March 20, 2009. (*Id.*) In terms of plaintiff's "allegation that his illnesses, injuries, or conditions affected his squatting, bending, standing, reaching, walking, kneeling, and stair climbing," the ALJ explained that the state-agency medical consultant had "found that [plaintiff] could stand and/or walk about six hours in an eight-hour workday and could occasionally climb, balance, stoop, kneel, crouch, and crawl." (*Id.* (citation omitted).) The ALJ also noted that plaintiff's "treating physicians never mentioned any limitations that [plaintiff] had prior to the date last insured." (*Id.*) Finally, with respect to plaintiff's "alleged depression and statement that he did not handle stress as well as he used to," the ALJ observed that plaintiff "had not sought mental health therapy or had any referrals for mental health therapy and had no mental health hospitalizations prior to the date last insured." (*Id.*)

As discussed above, the ALJ explained that she gave little weight to the consultative examination report of Dr. Singer, the Pennsylvania Department of Public Welfare "employability assessment" form, the treatment records of Dr. Ramanathan, and the "gastritis/irritable bowel syndrome" medical-assessment form completed by Dr. Shah. (*Id.*) The ALJ further explained that she gave "great weight" to the state-agency medical consultant's assessment of plaintiff's residual functional capacity. (*Id.*) She explained that the medical consultant's assessment was "for the period prior to the date last insured" and was "consistent with the severity of [plaintiff's] medically determinable impairments as found in the medical evidence of record, particularly given that [plaintiff's] treating physicians did not mention any limitations that [plaintiff] had." (*Id.*)

In challenging the ALJ's assessment of his residual functional capacity, plaintiff asserts that the ALJ picked his residual functional capacity "out of the sky," without proper analysis.

(Pl.'s Br. at 20.) Plaintiff alleges three specific errors, asserting that the ALJ improperly rejected the assessments of his residual functional capacity provided by his treating physician and others, failed to consider the side effects of his pain medication, and failed to properly consider his subjective complaints of pain and fatigue.[13] While I agree that the ALJ did not adequately explain why she failed to include certain postural limitations in plaintiff's residual functional capacity, this was ultimately a harmless error, and I find no merit in plaintiff's other alleged errors.

### 1.     Assessments of Residual Functional Capacity by Plaintiff's Treating Physician and Others

Plaintiff claims that the ALJ improperly rejected the assessments of his residual functional capacity provided by his treating physician, the consultative examination report of Dr. Singer, and the Pennsylvania Department of Public Welfare "employability assessment" form.

With respect to his treating physician's assessment of residual functional capacity, it is not clear whether plaintiff is referring to the "gastritis/irritable bowel syndrome" medical-assessment form completed by Dr. Shah or to the treatment records of Dr. Ramanathan, or to both. In any event, as discussed above, the ALJ was justified in according little weight to both the form completed by Dr. Shah and the treatment records of Dr. Ramanathan, as well as to the consultative examination report of Dr. Singer and the Pennsylvania Department of Public Welfare form. Accordingly, I find no error in the ALJ's failure to include limitations set forth in these records when she assessed plaintiff's residual functional capacity.

---

[13] In his objections to the magistrate judge's report, plaintiff also asserts that the ALJ failed to consider the limitations imposed by plaintiff's "not severe" impairments, as required by SSR 96-8p, and that the magistrate judge did not address this failure. (Pl.'s Objections ¶ 21, at 11–12.) But plaintiff does not specify what "not severe" impairments he suffered from that the ALJ failed to properly take into account.

But the ALJ did not adequately explain why she apparently rejected the state-agency medical consultant's finding that plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl and failed to include such postural limitations in plaintiff's residual functional capacity—even though she accorded "great weight" to the medical consultant's assessment. Although the ALJ noted that plaintiff's treating physicians had "never mentioned any limitations that [plaintiff] had prior to the date last insured" (R. 17), it is not clear whether the ALJ found these postural limitations to be inconsistent with the other medical evidence or whether the ALJ simply overlooked them when she stated her conclusion as to plaintiff's residual functional capacity.[14]

In any event, because, as discussed in more detail in section D below, these postural limitations do not affect plaintiff's ability to do a full range of light work and thus do not diminish the occupational base for light work, any error in the ALJ's failure to include plaintiff's postural limitations in her assessment of his residual functional capacity was harmless.

## 2.    Medication Side Effects

Plaintiff also contends that the ALJ failed to consider the side effects of his medications. I find no merit in this argument, however, because plaintiff has failed to point to any side effects from medication he was taking before his insured status expired on December 31, 2007.

Beyond plaintiff's testimony that he had been taking Percocet on and off since the onset of his pancreatitis (R. 37), there is no evidence that plaintiff was consistently taking any

---

[14] Notably, in connection with the original denial of plaintiff's disability claim on April 21, 2009, the disability examiner concluded that plaintiff had the residual functional capacity to perform light work but stated that his postural limitations constituted a nonexertional limitation. (R. 49.)

medication between his alleged onset date of June 1, 2005, and the expiration of his insured status on December 31, 2007. At the time of his hospitalization in July 2007, for example, plaintiff did not report taking any medications (R. 209), and he was not prescribed any medications upon his discharge (R. 212). Moreover, even to the extent that he was periodically taking Percocet for his pain, he has pointed to nothing in the record describing any side effects he experienced before December 31, 2007.[15]

Plaintiff contends that the ALJ failed to take into account the fact that plaintiff could not afford the medication that he was prescribed and therefore was not taking his medication consistently. While the record does support plaintiff's claim that he could not afford all his medications, that does not change the fact that plaintiff has not pointed to any side effects he experienced when he was actually taking such medication (or to any side effects he would experience if he were taking his medication).

In the absence of any evidence as to side effects plaintiff allegedly experienced before December 31, 2007, when his insured status expired, plaintiff's argument that the ALJ erred in failing to consider such side effects in assessing his residual functional capacity must fail.

### 3. Plaintiff's Subjective Complaints

Plaintiff contends that, in determining his residual functional capacity, the ALJ failed to properly consider his subjective complaints of pain and fatigue. I disagree.

In determining whether an individual is disabled, the Commissioner must "consider all of [the individual's] statements about [his] symptoms, such as pain, and . . . how the symptoms

---

[15] At his hearing before the ALJ on April 8, 2010, plaintiff testified as to the side effects he experienced from the medication he was then taking. (R. 34–35.) But there is no evidence in the record that plaintiff was taking those medications before December 31, 2007.

affect [his] . . . ability to work." 20 C.F.R. § 404.1529(a). An individual cannot prove that he is disabled by subjective complaints of pain and other symptoms alone, however. Rather, subjective complaints must be accompanied by medical and other evidence demonstrating that the individual has a medically determinable impairment that could reasonably cause the symptoms alleged. *See id.* § 404.1529(b). Once a medically determinable impairment is established, the ALJ must then evaluate the intensity and persistence of the symptoms and determine the extent to which the symptoms limit the individual's ability to work. *See id.* § 404.1529(c). This requires the ALJ to determine the credibility of the individual's subjective complaints. *See Hartranft*, 181 F.3d at 362 ("This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."); *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996) (clarifying when an ALJ must make a credibility finding and explaining the factors to be considered in assessing the credibility of an individual's subjective complaints).

Here, the ALJ found that plaintiff's impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not fully credible. Plaintiff challenges this credibility determination, arguing that the ALJ failed to consider all the factors set forth in SSR 96-7p and that the ALJ's finding is not supported by substantial evidence.

SSR 96-7p explains that "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that . . . 'the allegations are (or are not) credible.'" SSR 96-7p, 1996 WL 374186, at *2. Rather, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight." *Id.* SSR 96-7p sets forth seven factors, in addition to the objective medical evidence, to be considered in assessing credibility: (1) the "individual's daily activities"; (2) the "location, duration, frequency, and intensity of the individual's pain or other symptoms"; (3) "[f]actors that precipitate and aggravate the symptoms"; (4) the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms"; (5) "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms"; (6) "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms"; and (7) "[a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3.

Although the ALJ did not expressly discuss each of these factors, I see no error in the ALJ's credibility determination. The ALJ properly considered plaintiff's complaints in light of the medical evidence, his treatment history, and all of the other evidence in the record. With respect to plaintiff's complaints of fatigue, for example, the ALJ explained that there was no evidence that plaintiff had sought, or received referrals for, treatment for fatigue before his date last insured. And with respect to plaintiff's allegations of other limitations caused by pain, the ALJ explained that the evidence did not support such allegations. The ALJ noted, for example, that the state-agency medical consultant, in his assessment of plaintiff's residual functional capacity as of December 31, 2007, had found that plaintiff could sit, stand, or walk for six hours in an eight-hour workday, and that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. The ALJ also noted that none of plaintiff's treating physicians had contemporaneously mentioned any limitations that plaintiff had before his date last insured.

The ALJ's decision thus made clear both to plaintiff and to subsequent reviewers that

plaintiff's complaints of disabling pain and fatigue were not accepted because they conflicted with the other evidence in the record. Moreover, other than the assessment form completed by Dr. Shah and Dr. Singer's consultative examination report, which I have already determined the ALJ properly accorded little weight, plaintiff points to nothing in the record that substantiates his complaints of pain and fatigue before his date last insured.

I thus conclude that the ALJ gave proper consideration to plaintiff's subjective complaints of pain and fatigue and that the ALJ's credibility determination was supported by substantial evidence in the record.

In sum, I find no merit in plaintiff's claim that the ALJ picked his residual functional capacity "out of the sky." (Pl.'s Br. at 20.) While I agree that the ALJ did not adequately explain why she failed to include certain postural limitations in plaintiff's residual functional capacity, as I discuss in the next section below, this was ultimately a harmless error. And I find no merit in plaintiff's other challenges to the ALJ's assessment of his residual functional capacity.

### D.    Reliance on Medical-Vocational Guidelines

Finally, plaintiff contends that the ALJ erred by ignoring the vocational expert's testimony and relying solely on the medical-vocational guidelines in determining, at step five, that plaintiff could perform jobs that exist in significant numbers in the national economy. I disagree.

At the hearing before the ALJ, in response to hypothetical questions posed by plaintiff's counsel, the vocational expert testified that someone "in constant pain on strong narcotic medications who was fatigued [and] . . . had to take naps throughout the day" would be unable to engage in substantial gainful activity. (R. 41–42.) The vocational expert similarly testified that an

individual who had "to take many breaks throughout the day because of abdominal issues, having to go to the bathroom," would not be able to engage in substantial gainful activity, because taking breaks beyond "one break in the morning, [and] one break in the afternoon plus lunch . . . would not be acceptable." (R. 42.)

Nonetheless, the ALJ concluded that plaintiff could perform jobs that exist in substantial numbers in the national economy. In reaching this conclusion, the ALJ did not address the vocational expert's testimony, but instead relied solely on the medical-vocational guidelines.

### 1.     Rejection of Vocational Expert's Testimony

Plaintiff claims that the ALJ improperly ignored the testimony of the vocational expert, but I see no error. An ALJ may disregard a vocational expert's opinion to the extent that it is based on a hypothetical question containing assumptions that are not supported by the record. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (concluding that ALJ properly disregarded vocational expert's opinion where it was based on claimant's allegations that ALJ did not find credible); *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993) (approving ALJ's disregard of vocational expert's response to hypothetical posed by claimant's attorney that required expert to assume unestablished facts); *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (concluding that ALJ's rejection of vocational expert's testimony was reasonable where medical evidence did not support hypothetical assumptions posed to vocational expert); *cf. Rutherford*, 399 F.3d at 554 (explaining that an ALJ is not required "to submit to the vocational expert every impairment *alleged* by a claimant" but must convey to the vocational expert only "a claimant's *credibly established limitations*").

Here, the hypothetical questions posed to the vocational expert by plaintiff's attorney

included limitations that were not supported by the record before plaintiff's date last

insured—they arose only after plaintiff's insured status expired. Plaintiff's assertion that the

limitations are supported by the "gastritis/irritable bowel syndrome" medical-assessment form

completed by Dr. Shah on May 12, 2009, as well as by his allegations of pain and fatigue, is

unavailing. As discussed above, the ALJ found no evidence in the record corroborating Dr.

Shah's opinion that the limitations he described existed before January 1, 2008, and thus properly

discounted his opinion. Similarly, the ALJ reasonably found that plaintiff's claims of disabling

pain and fatigue lacked credibility. Because the hypothetical questions posed to the vocational

expert did not reflect plaintiff's limitations as of his date last insured, the ALJ was entitled to

disregard the expert's opinion.

### 2.        Use of Medical-Vocational Guidelines

Plaintiff also contends that the ALJ erred in relying solely on the medical-vocational

guidelines to establish that jobs that plaintiff could perform exist in significant numbers in the

national economy. Plaintiff argues that his nonexertional limitations precluded the ALJ from

relying solely on the guidelines. I disagree.

Plaintiff asserts several nonexertional limitations, including pain, fatigue, the side effects

from his medication, and the need for frequent bathroom breaks. As discussed above, however,

the evidence does not support a finding that those limitations existed before plaintiff's insured

status expired. But plaintiff also asserts that he had certain postural limitations—according to the

state-agency medical consultant, whose opinion the ALJ accorded great weight, plaintiff could

climb, balance, stoop, kneel, crouch, or crawl only occasionally. As previously discussed, the

ALJ did not adequately explain why she did not include this nonexertional limitation in her

assessment of plaintiff's residual functional capacity. I thus assume here, for purposes of

determining whether the ALJ properly relied on the medical-vocational guidelines, that this

nonexertional limitation existed before plaintiff's insured status expired.

The Third Circuit has held that, "in the absence of a rulemaking establishing the fact of an

undiminished occupational base," an ALJ cannot rely solely on the medical-vocational guidelines

when a claimant has both exertional and nonexertional limitations; the court asserted that "the

Commissioner cannot determine that a claimant's nonexertional impairments do not significantly

erode his occupational base under the medical-vocational guidelines without . . . taking

additional vocational evidence establishing as much." *Sykes v. Apfel*, 228 F.3d 259, 261 (3d Cir.

2000). But an ALJ may "rely on [a Social Security Ruling] as a replacement for a vocational

expert" and use the guidelines if it is "crystal-clear that the [Social Security Ruling] is probative

as to the way in which the nonexertional limitations impact the ability to work and thus, the

occupational base." *Allen v. Barnhart*, 417 F.3d at 407.

Here, had the ALJ included plaintiff's postural limitations in his residual functional

capacity, the ALJ could have relied on SSR 83-14 in lieu of a vocational expert. SSR 83-14

explains that, although stooping and crouching "must be done frequently . . . in most medium,

heavy, and very heavy jobs, . . . to perform substantially all of the exertional requirements of

most sedentary and light jobs, a person would not need to crouch and would need to stoop only

occasionally." SSR 83-14, 1983 WL 31254, at *2 (1983). Indeed, while "the frequent lifting or

carrying of objects weighing up to 10 pounds (which is required for the full range of light work)

implies that the worker is able to do occasional bending of the stooping type," the "inability to

ascend or descend scaffolding, poles, and ropes" and the "inability to crawl on hands and knees"

are "nonexertional limitations or restrictions which have very little or no effect on the unskilled

light occupational base." *Id.* at *4–5.

Because SSR 83-14 makes it "crystal-clear" that plaintiff's postural limitations do not diminish the occupational base for light work, it was appropriate for the ALJ to rely on the medical-vocational guidelines in determining that jobs that plaintiff could perform exist in significant numbers in the national economy.

## IV.    CONCLUSION

For the reasons set forth above, I will overrule plaintiff's objections to the magistrate judge's report and recommendation, and will affirm the final decision of the Commissioner. An appropriate order accompanies this memorandum.